1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOHN EDWARD MITCHELL,                          No.  2:09-cv-3012 JAM KJN P

12                 Plaintiff,

13          v.                                      FINDINGS AND RECOMMENDATIONS

14   J. HAVILAND, et al.,

15                 Defendants.

16

17   I.  Introduction

18          Plaintiff is a state prisoner, proceeding without counsel.  Plaintiff raises Eighth and First

19   Amendment claims.  Defendants' motion for summary judgment is before the court.  As set forth

20   more fully below, the undersigned finds that defendants' motion for summary judgment should be

21   granted in part and denied in part.

22   II.  Plaintiff's Second Amended Complaint

23          This action is proceeding on plaintiff's allegations that on three separate occasions

24   defendant Rosario used excessive force in violation of the Eighth Amendment, and defendants

25   Rosario, Garcia, and McGuire retaliated against plaintiff in violation of the First Amendment.[1]

26   _____

27   [1]  By order filed April 11, 2013, the following claims were dismissed:  excessive force claim
     against defendant Easterling; and retaliation claims against defendants Bickham, Cappel, Singh,
28   and Haviland.  (ECF No. 66.)

                                                    1

In his verified second amended complaint ("SAC"), plaintiff alleges that on August 5, 2008, defendant Rosario used excessive force in taking plaintiff down during an escort. Plaintiff claims he suffered injuries to his left shoulder and back. (ECF No. 51 at 4, 7.) Plaintiff received a Rules Violation Report ("RVR") S1-08-08-1142-R for "Resisting Staff Resulting in the Use of Force." (ECF No. 54-3 at 3-6.) Plaintiff was found guilty at a disciplinary hearing, based on the findings that plaintiff attempted to break free from defendant Rosario's escort by abruptly stopping and trying to spin away, necessitating the use of force to gain control of plaintiff. Plaintiff was assessed a credit forfeiture of ninety days. (Id.)

Plaintiff alleges that he was placed in administrative segregation ("ad seg") on August 5, 2008, and that on August 14, 2008, he was transferred from ad seg to yard one. (ECF No. 51 at 5.) The next day, plaintiff told a correctional sergeant that plaintiff wanted to file an excessive force complaint concerning the August 5, 2008 incident. On August 16, 2008, plaintiff filed an administrative appeal alleging an excessive use of force on August 5, 2008, Log No. CSP-S-08-03370. (ECF No. 38-3 at 4.)[2] He was returned to ad seg on August 16, 2008. (ECF No. 51 at 5.)

On November 2, 2008,[3] plaintiff was released from ad seg to yard one. On November 3, 2008, as plaintiff exited the dining hall, past Correctional Officers Rosario, Garcia, and Freitas, plaintiff claims he heard defendant Rosario allegedly say, "Lock his ass up, I'll stand over, that's the muthafucker I have to go to court about." (ECF No. 51 at 5.) Defendant Garcia allegedly stopped plaintiff and ordered him to a wall, and searched and handcuffed plaintiff. Defendant Rosario then allegedly said, "take him to medical for a 7219." (Id.) Plaintiff alleges that Correctional Officer Freitas asked "what did he do?" and then went and told Lt. Bickham, who ordered defendant Garcia to bring plaintiff to the office. (Id.) Plaintiff alleges that he and defendant Rosario were questioned, and plaintiff was released to his cell, where plaintiff filed complaint 08-3956 on November 3, 2008. (Id.) Plaintiff asserts that defendant Rosario ordered

---

[2]  Defendants provided a copy of plaintiff's appeal CSP-S-08-3370 in connection with their earlier motion to dismiss. (ECF No. 38-3 at 2-10.)

[3]  Evidence now demonstrates that plaintiff was released from ad seg on October 31, 2008. (ECF No. 150-6 at 3.)

2

1    defendant Garcia to place plaintiff in mechanical restraints in retaliation for plaintiff's grievance

2    that Rosario had used excessive force on plaintiff.  (ECF No. 51 at 8.)

3        On February 16, 2009, plaintiff alleges he was called to the program office by defendant

4    McGuire who was to conduct a hearing on plaintiff's appeal, Log No. CSP-S-08-3956.  (ECF No.

5    51 at 6.)  Plaintiff claims that during the interview, McGuire allegedly asked whether plaintiff

6    wanted money; plaintiff allegedly responded that he wanted to make sure defendant Rosario no

7    longer hurt anyone else, and that plaintiff would not drop the complaint.  (ECF No. 51 at 6.)

8    Defendant McGuire allegedly responded that plaintiff "will leave the yard before my officer

9    does."  (Id.)  Plaintiff claims that defendant McGuire retaliated against plaintiff by wrongfully

10   confining plaintiff in ad seg because plaintiff chose not to drop a complaint against defendants

11   Rosario and Garcia for their actions on November 3, 2008.  (ECF No. 51 at 9.)

12       After returning to his cell, plaintiff alleges that Sgt. Fowler called plaintiff back to the

13   program office, where plaintiff was again asked about his appeal 08-3956.  Plaintiff alleges that

14   during this meeting, Sgt. Fowler allegedly reminded plaintiff that he was with plaintiff at Salinas

15   Valley State Prison during all the "Green wall stuff," and allegedly said that Fowler and

16   defendant Rosario were "homeboys."  (ECF No. 51 at 6.)  Plaintiff told Sgt. Fowler that he had a

17   right to file a complaint and would not drop it.  Plaintiff was told to return to his cell.

18       Minutes after returning to his cell, plaintiff alleges Correctional Officer Stephens arrived

19   and took plaintiff to ad seg.  (ECF No. 51 at 6.)

20   III.  Defendants' Motion for Summary Judgment

21       A.  Defendants' Motion

22       Defendant Rosario claims he is entitled to summary judgment on plaintiff's excessive

23   force claim because plaintiff's injuries were de minimis, and defendant Rosario was justified in

24   using physical force and used the least amount of physical force necessary to regain control of

25   plaintiff.

26       Defendants contend that plaintiff's retaliation claims fail because defendants Rosario,

27   Garcia, and McGuire lacked retaliatory intent.  Defendants argue that searches conducted during

28   the meal period are commonplace and take only a minute, and an officer may perform fifteen to

twenty such searches within the dining hour for institutional safety and security.  (ECF No. 150-1 at 20.)  Because plaintiff fails to demonstrate the November 3, 2008 search conditions were out of the ordinary, defendants contend that plaintiff failed to establish retaliatory intent on the part of defendants Rosario and Garcia.  Defendants contend that the three month delay between plaintiff's August 16, 2008 grievance and the alleged retaliatory act on November 3, 2008, is too great to establish a retaliatory motive on the part of defendants Rosario and Garcia.  (ECF No. 150-1 at 20.)  Moreover, defendants contend that defendant Garcia was not involved in the prior use of force incident and was unaware of such incident.  (ECF No. 150-1 at 21.)  Because defendants Garcia and Rosario were not regularly assigned the same shift, defendant Garcia did not know Rosario very well.  (Id.)

Further, defendants contend that the six month delay between the excessive force complaint on August 16, 2008, and the February 16, 2009 alleged retaliatory act fails to establish a retaliatory motive on the part of defendant McGuire.  (ECF No. 150-1 at 22.)  Moreover, defendants point out that defendant McGuire was not transferred to CSP-SOL until January of 2009, and was unaware of plaintiff's excessive force allegations against defendant Rosario, and of any grievances plaintiff had submitted prior to the February 16, 2009 meeting.  (Id.)

Defendants also argue that defendants' actions on November 3, 2008, and February 16, 2009, served legitimate penological interests of promoting institutional safety and security. Defendants Rosario and Garcia argue that random searches of inmates exiting the dining hall are required, and they were required to search plaintiff before escorting him into the program office to confirm his housing assignment to ensure he had no weapons.  Defendant McGuire argues that plaintiff's placement in ad seg on February 16, 2009, served a legitimate penological interest because McGuire believed that plaintiff's comments posed a safety threat to Rosario, and placing plaintiff in ad seg was appropriate pending further action by the facility captain and the classification committee.  (ECF No. 150-1 at 23.)

Finally, defendants argue they are entitled to qualified immunity because plaintiff's constitutional rights were not violated, and their actions were reasonable under the circumstances.

////

4

1

      B. Plaintiff's Opposition

2

         1. Alleged Excessive Force

3

     In opposition,[4] plaintiff argues that during the escort, when he realized he was not being

4

taken to ad seg, he "non-aggressively" turned his head to locate Sgts. Durfey and Easterling to

5

ask them where he was being taken, and that the escort slowed not just because plaintiff turned

6

his head, but because defendant Rosario was waiting for Sgt. Easterling.  Plaintiff points out that

7

in the RVR, defendant Rosario did not state that plaintiff "attempted to pull away," but stated that

8

plaintiff "stopped abruptly and attempted to spin away from [defendant] Rosario's grasp."  (ECF

9

No. 161-3 at 8.)  Plaintiff argues that because he was handcuffed behind his back, his actions of

10

turning his head and slowing the escort did not create a dangerous situation requiring his take-

11

down by defendant Rosario.  In addition, plaintiff argues that had defendant Rosario simply

12

pulled plaintiff to the ground, he would have landed on his buttocks rather than on his left side.

13

(Id.)  Plaintiff contends that because he was handcuffed behind his back, an attempt to "spin

14

away" from defendant Rosario would be almost impossible because the cuffs act as a bridle

15

enabling the officer to take the prisoner any way he desires.

16

     In addition, plaintiff argues that defendant Rosario's declaration stating that he gave

17

plaintiff "two or three verbal warnings to continue with the escort," (ECF No. 150-3 at 3),

18

conflicts with defendant Rosario's response to plaintiff's interrogatory number 12, in which

19

defendant stated that he "had no time to issue warnings or take other measures at the time that

20

Plaintiff attempted to break free from the escort," (ECF No. 162 at 16).

21

     Further, plaintiff contends that his injuries were not de minimis, as evidenced by the

22

progress notes from August 6, 2008, where plaintiff presented with low back pain and spasms and

23

24

[4]  In his opposition, plaintiff again raises claims concerning what the videotapes would show.
However, the court previously addressed the videotape issues, and found that plaintiff adduced no

25

evidence demonstrating that a videotape of the August 5, 2008 incident ever existed, and declined
to issue sanctions for the missing videotape of the August 16, 2008 use of force interview because

26

plaintiff adduced no evidence that "defendants willfully or intentionally destroyed or lost the
August 16, 2008 videotape in bad faith."  (ECF No. 141 at 7-8.)  In addition, the court found that

27

there were other methods plaintiff could use to prove the extent of his injuries.  (ECF No. 141 at

28

8.)  Thus, plaintiff's arguments concerning "what the videotape would show" are disregarded.

sharp pain in his left posterior shoulder, his August 15, 2008 medical report where plaintiff complained of low back pain from the incident, and the MRI of his lumbar spine which "indicates evidence of trauma." (ECF No. 161-5 at 54, 56, 58.)  On August 6, 2008, plaintiff was given an injection of Toradol, and prescribed oral Ibuprofen.  (ECF No. 161-5 at 58-59.)  Plaintiff argues that the left shoulder x-ray report states that "There is a calcific plaque just below the inferior glenoid rim consistent with changes of prior trauma or possibly arthritis," taken in conjunction with plaintiff's left shoulder abrasion sustained during the August 5, 2008 escort demonstrates plaintiff sustained more than de minimis injuries.  (ECF No. 161-3 at 17.)  Plaintiff contends that to this day he takes pain medications because he suffers chronic pain from "debilitating shocks that radiate down his back to his feet requiring him to wear a back brace, orthopedic shoes." (ECF No. 161-3 at 18.)  Plaintiff claims that he is not allowed to have a job assignment that requires him to bend repetitively, twist or lift over 20 pounds.  (ECF No. 161-3 at 53 [accommodation chrono].)  Plaintiff contends that his back injury was most likely caused when defendant Rosario "applied pressure to the middle" of plaintiff's back.  (ECF No. 161-3 at 18.) Plaintiff argues that the absence of proof of minor or significant injury should not mandate dismissal because plaintiff contends that defendant Rosario acted out of malice with the very purpose of causing plaintiff harm.  ECF No. 161-3 at 18, citing Hudson v. McMillian, 503 U.S. 1, 9 (1992) ("In the excessive force context, society's expectations are different.  When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. . . . This is true whether or not significant injury is evident.")  Plaintiff contends that he adduced evidence of the use of wanton, unnecessary force resulting in severe pain which constitutes a material dispute of fact requiring a jury to decide.  (ECF No. 161-3 at 19.)

In response to defendants' claim that plaintiff has no admissible evidence to support his claim that he suffered lasting back injuries after the August 5, 2008 incident, plaintiff states he cannot seek independent medical advice from a specialist or his personal physician to corroborate his allegations regarding his injuries.  (ECF No. 161-3 at 19.)  Therefore, plaintiff asks the court to recognize that his affidavit is "the best that can be expected at the summary judgment phase."

6

1   (ECF No. 161-3 at 19, quoting <u>Norman v. Taylor</u>, 25 F.3d 1259, 1265 (4th Cir. 1994) (Hall, J.,

2   dissenting), <u>abrogated by</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34 (2010).)[5]

3          Plaintiff argues that the second and fourth <u>Hudson</u> factors weigh in plaintiff's favor

4   because defendant Rosario could not have reasonably perceived plaintiff's actions as threatening.

5   (ECF No. 161-3 at 20.)  Plaintiff contends that defendant Rosario never lost control of plaintiff,

6   who was handcuffed behind his back.  Plaintiff points out that he weighs 145 pounds and

7   defendant Rosario weighed at least 250 pounds.  Plaintiff claims that defendant Rosario held

8   plaintiff with both hands, one between the cuffs by the chain, and the other by the arm of plaintiff,

9   which plaintiff claims prevented plaintiff from turning away or moving in a direction that Rosario

10  didn't want plaintiff to go.  Plaintiff contends that there was no need for defendant to slam

11  plaintiff in the way he did.  Plaintiff states that defendant Rosario

12          yanked plaintiff into the air slamming him into the ground, and
13          once [plaintiff] was on the ground, still secure and in restraints,
            Rosario rolled plaintiff over on his stomach and applied all 250 plus
14          pounds of pressure onto [plaintiff's] spine, not because plaintiff was
            still allegedly attempting to break free, but to maliciously and
15          sadistically inflict pain.

16  (ECF No. 161-3 at 21.)  Further, plaintiff contends that once he was prone on the ground, face

17  down, his hands handcuffed behind his back, there was no need for defendant Rosario to apply

18  pressure on plaintiff's back with all of defendant's weight because plaintiff was not resisting.

19          Plaintiff argues that there was no need for the amount of force used, and contends that any

20  perceived threat to safety of staff and inmates was not that great given that plaintiff was

21  handcuffed behind his back during the entire incident.

22          Moreover, plaintiff contends that there were prior opportunities for defendant Rosario to

23  avoid or temper the severity of the use of force by following prison regulations when plaintiff

24  _____

25  [5]  In <u>Wilkins</u>, the Court held that the core judicial inquiry when a prisoner alleges that prison
    officers used excessive force against the prisoner is not whether a certain quantum of injury was
26  sustained, but rather whether force was applied in a good faith effort to maintain or restore
    discipline, or maliciously and sadistically to cause harm.  <u>Id.</u>  "To conclude, as the District Court
27  did here, that the absence of 'some arbitrary quantity of injury' requires automatic dismissal of an
    excessive force claim improperly bypasses this core inquiry."  <u>Id.</u>, 559 U.S. at 39, citing <u>Hudson</u>,
28  503 U.S. at 9.

initially refused the cellmate.  Plaintiff argues that after plaintiff complied with Rosario's request

to cuff up, officers should have closed plaintiff's cell door and issued an RVR for refusing a

direct order rather than attempting to escort plaintiff to the new cellmate.  Or, in the alternative,

plaintiff argues that defendant Rosario could have escorted plaintiff to ad seg.  Plaintiff disputes

defendant Rosario's new claims that he gave two or three warnings for plaintiff to "calm down"

during the escort, and appears to contend that no warnings were given during the escort.

### 2.  Retaliation Claims:  Defendants Rosario and Garcia

Plaintiff claims that on November 3, 2008, as plaintiff exited the dining hall, plaintiff was

stopped, searched, and placed in restraints and escorted toward medical for a pre ad seg medical

evaluation by defendant Garcia because defendant Rosario told Garcia to do it because Rosario

said, "plaintiff is the muthafucker I have to go to court about." (ECF No. 161-3 at 23.)  Plaintiff

claims defendant Rosario's instructions were given in retaliation for the excessive force

complaint plaintiff filed, and contends the mere threat of harm is sufficient to demonstrate

adverse action.  Plaintiff contends that the order served no legitimate penological purpose.

Plaintiff argues that because there was no subsequent ad seg placement raises an inference that

Rosario's order was given with retaliatory intent.  Plaintiff contends that Garcia did not order

plaintiff to stop, frisk and handcuff plaintiff based on a belief that plaintiff was smuggling food or

contraband or that plaintiff was in an unauthorized area, but because Garcia believed he would

eventually have to answer to the court for his use of excessive force because plaintiff was just

released from ad seg after the investigation had closed.  (ECF No. 161-3 at 25.)  Plaintiff argues

that Rosario's statement evidences Rosario's retaliatory intent.  (ECF No. 161-3 at 26.)  Plaintiff

contends he suffered an anxiety attack once he was returned to his cell on November 3, 2008.

Plaintiff argues that there was no legitimate penological purpose in placing plaintiff in mechanical

restraints on November 3, 2008, but that the action was arbitrary and unnecessary.  (ECF No.

161-3 at 27.)

### 3.  Retaliation Claim:  Defendant McGuire

Plaintiff asserts that his retaliation claim is supported by his administrative appeal which

shows that McGuire's statement about thinking about locking plaintiff up was made before the

8

1  alleged threat by plaintiff against Rosario.  Moreover, plaintiff notes that defendant McGuire has

2  now added a claim that plaintiff allegedly stated "I'm not going to be responsible for what

3  happened if Rosario stayed on the yard," that is not documented in the administrative appeal.

4  (ECF No. 161-3 at 24.)  Plaintiff argues that the causal connection is demonstrated by McGuire's

5  words and the timing of the retaliatory act.  Plaintiff argues that his assertion of his First

6  Amendment right to file a grievance against Rosario regarding the November 3, 2008 incident

7  was the reason he was placed in ad seg.  Plaintiff contends that McGuire's alleged statement that

8  "this is going to stop, I am seriously thinking about locking you up," raises an inference of

9  retaliatory intent because it implied that McGuire was going to punish plaintiff because he filed a

10  grievance against defendant Rosario.  (ECF No. 161-3 at 26.)  Further, plaintiff contends this

11  inference is bolstered by McGuire's alleged statement, "you will be leaving before my officer."

12  (Id.)  In addition, plaintiff argues that defendant's claim that he believed plaintiff posed a threat to

13  Rosario is refuted by the fact that plaintiff was not immediately placed in ad seg, but, in fact, was

14  not taken to ad seg until more than three hours after the interview.  (ECF No. 161-3 at 26.)

15  Plaintiff alleges that in addition to being placed in ad seg, he had to drop his college

16  correspondence course, lost contact visits, and was unable to attend religious services.  (ECF No.

17  161-3 at 27.)  Plaintiff contends that there was no legitimate penological purpose to his placement

18  in ad seg because of McGuire's statements to plaintiff reflecting his retaliatory intent.[6]

19           C.  Defendants' Reply

20           In reply, defendants contend that plaintiff failed to raise a factual dispute concerning

21  defendant Rosario's use of force because plaintiff concedes that during the August 5, 2008 escort,

22  he turned his head to the left and right in attempts to locate the sergeants; started walking at a

23  slower pace during the escort; the escort came to a complete stop; and defendant Rosario took

24  plaintiff down to the ground.  (ECF No. 166 at 2.)  Defendants argue that these facts demonstrate

25  _____

26  [6]  In plaintiff's statement of disputed facts submitted with his opposition, plaintiff includes facts pertinent to alleged due process violations.  (ECF No. 161-1 at 3, 9-10.)  However, as set forth

27  above, this action proceeds solely on plaintiff's First and Eighth Amendment claims. Specifically, plaintiff's claims that his due process rights were violated during hearings on

28  plaintiff's appeals, Log No. S1-08-0801142 and S1-08-0801142R, are not at issue in this action.

1  that no dispute exists that defendant Rosario perceived plaintiff as a threat given plaintiff's

2  conduct.  Defendants contend that plaintiff submitted no evidence to show that there was any

3  delay or time for reflection between plaintiff's slowing down and stopping during the escort and

4  the moment defendant Rosario took plaintiff down to the ground.  Defendants argue that

5  defendant Rosario's conduct was reasonable because his use of force was necessary to restore

6  order, and was reasonable under a qualified immunity analysis.

7          In connection with plaintiff's retaliation claim against defendants Rosario and Garcia,

8  defendants argue that even under plaintiff's version of the November 3, 2008 incident, defendants

9  are entitled to summary judgment.  Defendants argue that plaintiff's statement in his declaration

10  that he "believed" Rosario said something to the effect that Plaintiff was the reason Rosario had

11  to go to court does not constitute evidence.  (ECF No. 166 at 2, citing ECF No. 161-4 at 21.)

12  Defendants contend that plaintiff failed to adduce admissible evidence that Rosario had the

13  requisite retaliatory intent, or that plaintiff suffered any adverse action as a result of Rosario's

14  conduct.  Defendants point out that plaintiff conceded in his declaration that Rosario did not

15  search, handcuff, or escort plaintiff to some other location.  Defendants argue that plaintiff's

16  retaliation claim against defendant Garcia fails for the same reasons.  Defendants contend that

17  plaintiff failed to submit any evidence demonstrating that Garcia's search was retaliatory rather

18  than a random search which served a legitimate correctional purpose.  Defendants argue that

19  plaintiff's deposition testimony that Garcia called plaintiff over and ordered him to submit to a

20  search as plaintiff was walking towards Garcia and Rosario supports their position.  Defendants

21  contend that no reasonable inference exists that Garcia searched plaintiff for an improper purpose

22  or that Garcia would not have searched plaintiff but for Rosario's comment, even if it were

23  admissible.

24          D.  Plaintiff's Surreply

25          Finally, on October 5, 2014, under the mailbox rule, Douglas v. Noelle, 567 F.3d 1103,

26  1109 (9th Cir. 2009), plaintiff filed a surreply.  However, there is no provision in the local rules

27  for a surreply.  Local Rule 230(l) provides for a moving brief, an opposition, and a reply.

28  Briefing for motions in prisoner actions is final after the time for reply has expired.  Defendants

1   filed their reply to plaintiff's opposition to defendants' motion for summary judgment on

2   September 22, 2014, thus closing the time for further response regarding the motion.  Plaintiff

3   filed his surreply without the court's leave to do so.  Accordingly, plaintiff's surreply is

4   disregarded.

5        A.  Legal Standard for Summary Judgment

6        Summary judgment is appropriate when it is demonstrated that the standard set forth in

7   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

8   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

9   judgment as a matter of law."  Fed. R. Civ. P. 56(a).

10              Under summary judgment practice, the moving party always
11         bears the initial responsibility of informing the district court of the
            basis for its motion, and identifying those portions of "the
12         pleadings, depositions, answers to interrogatories, and admissions
            on file, together with the affidavits, if any," which it believes
13         demonstrate the absence of a genuine issue of material fact.

14   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

15   56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving party need

16   only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

17   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

18   387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

19   committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

20   burden of production may rely on a showing that a party who does have the trial burden cannot

21   produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

22   should be entered, after adequate time for discovery and upon motion, against a party who fails to

23   make a showing sufficient to establish the existence of an element essential to that party's case,

24   and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

25   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

26   necessarily renders all other facts immaterial."  Id. at 323.

27        Consequently, if the moving party meets its initial responsibility, the burden then shifts to

28   the opposing party to establish that a genuine issue as to any material fact actually exists.  See

1  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

2  establish the existence of such a factual dispute, the opposing party may not rely upon the

3  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

4  form of affidavits, and/or admissible discovery material in support of its contention that such a

5  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

6  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

7  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

8  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

9  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

10  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

11  (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

12  1564, 1575 (9th Cir. 1990).

13      In other words, "the mere existence of some alleged factual dispute between the parties

14  will not defeat an otherwise properly supported motion for summary judgment. . . ."  Anderson,

15  477 U.S. at 247-48.  Rather, there must be no *genuine* dispute as to any *material* fact in order for

16  a case to survive summary judgment.  Material facts are those "that might affect the outcome of

17  the suit."  Id. at 248.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of

18  summary judgment."  T.W. Elec. Serv., 809 F.2d at 630.

19      In the endeavor to establish the existence of a factual dispute, the opposing party need not

20  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

21  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

22  trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

23  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

24  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

25  amendments).

26      In resolving a summary judgment motion, the court examines the pleadings, depositions,

27  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

28  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

12

255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on June 13, 2014 (ECF No. 150), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

B.  Facts[7]

1.  At all relevant times, plaintiff was in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), and housed at California State Prison, Solano ("CSP-SOL").

2.  Defendant Rosario worked as a correctional floor officer in building 4, Yard 1, for over two years.

3.  In November 2008, Defendant Garcia was a relief officer assigned to various locations at CSP-Solano and filled in for other officers on their days off, including vacation, regular days off, and sick leave.

4.  Defendant McGuire was a Correctional Lieutenant who transferred to CSP-SOL for a limited-term position in mid-January 2009.  The limited-term position was set for one year; however, when a permanent full-time lieutenant position at California State Prison-Sacramento

---

[7]  For purposes of the instant motion for summary judgment, the court finds the following facts undisputed, unless otherwise indicated.  Documents submitted as exhibits are considered to the extent they are relevant, and despite the fact that they are not authenticated because such documents could be admissible at trial if authenticated.

unexpectedly became available, McGuire accepted that position and transferred to Sacramento approximately one and half months later, around March 2009.

5.  CSP-Solano contains four different yards or facilities.  Each yard houses approximately 1,200 inmates, and is enclosed in order to prevent interaction between inmates in the different yards.

6.  There are six buildings within each yard.  Yard 1houses buildings 1-6, Yard 2 houses buildings 7-12, and so on.

7.  Building 10 is the ad seg unit.  Building 9 is sometimes used as overflow for ad seg inmates.

8.  For safety purposes, supervision of each housing unit is generally conducted by two floor officers at a time.

9.  Gaining access to a different yard or facility is extremely difficult.

10.  If an inmate is in an unauthorized location, Rosario's usual custom and practice is to approach the inmate with another officer, immediately search the inmate to ensure he is not concealing any weapons, and escort the inmate to the program office to ascertain the inmate's housing assignment.[8]

11.  Because of the dangers inherent in a prison setting, if an inmate makes remarks that may be construed as a threat to the safety of another person, it is McGuire's usual custom and practice to order the temporary placement of that inmate in ad seg.  McGuire does not ignore remarks from an inmate that may be construed as a threat to the safety of another individual.

12.  Immediately after ordering an inmate's placement in ad seg., for safety and security reasons, McGuire reports the incident to his supervisor and the Unit Classification Committee to determine the best course of action at that point.

---

[8]  Plaintiff admits this fact as to the immediate search to ensure the inmate has no weapons, but denies the fact as to the escort to the program office to ascertain the inmate's housing assignment. Plaintiff cites as evidence his statement that he was not escorted to the program office by Rosario on November 3, 2008, and claims plaintiff has never been searched or escorted by Rosario on any date or at any time.  However, fact 10 addresses defendant Rosario's usual custom and practice, and does not address the specifics of what happened on November 3, 2008.  Moreover, it is undisputed that Garcia escorted plaintiff.

14

13.  Once the inmate's placement is under review by the captain and the Unit Classification Committee, McGuire no longer has authority over the inmate's housing assignment.

14.  During the meal period, inmates from all six buildings for the yard are released at staggered intervals to come to the cafeteria.

15.  During each meal period, a housing officer from each of the six buildings on Yard 1 provides security coverage of the dining hall area.

16.  Security coverage for the Yard 1 cafeteria includes supervising the inmates from Yard 1 as they enter and exit the cafeteria, and while they congregate inside the cafeteria to eat. Officers providing security coverage, check identification cards upon entry and ensure that inmates do not smuggle contraband items in or out of the cafeteria.

17.  Meal time presents a higher risk that inmates will smuggle contraband because it is a time when a large number of inmates congregate together in the same area. Inmates may also attempt to smuggle food out of the dining hall in order to sell or barter with other inmates.

18.  To maintain institutional safety and security, officers must conduct random "pat down," or "clothed-body" searches of inmates as they enter and exit the dining hall during the meal period.

19.  A clothed search consists of a brief "pat down" over the top of the inmate's clothing to feel for any concealed items, such as contraband or weapons. The search takes approximately one minute.  Clothed body searches are routine and these types of searches are not documented.

20.  Officers also conduct searches based on a reasonable suspicion of improper inmate activity.

21.  An officer providing meal time coverage can regularly conduct between fifteen and twenty searches.

22.  When Rosario and Garcia conduct a clothed search of an inmate entering or exiting the cafeteria, they follow the rules and regulations set forth by the California Department of

////

////

15

Corrections.  Rosario and Garcia conduct searches to maintain the safety and security of the dining area.[9]

23.  From April 21, 2007, until August 5, 2008, plaintiff was housed in building 4, Yard 1, cell 247.

24.  Plaintiff did not have a cellmate on August 5, 2008, but was cleared to be double-celled.

25.  Due to the arrival of inmates in Receiving and Release that needed housing, plaintiff was assigned a cellmate.  Defendants contend that plaintiff was scheduled to be escorted to his new cell in building 2, Yard 1, on August 5, 2008, but plaintiff claims he had no prior knowledge of such a scheduled escort.  (ECF No. 161-2 at 3.)

26.  On August 5, 2008, Rosario worked an overtime shift as a third watch search and escort officer.  While performing his duties that evening, Rosario was required to escort Plaintiff from building 4 to building 2.

27.  At approximately 8:35 p.m., Rosario and Sergeant Easterling arrived at Plaintiff's cell to escort him to his new housing assignment in building 2.  Plaintiff claims Sgt. Durfey was with them, and plaintiff declares that prior to the arrival of Rosario, Easterling and Durfey, plaintiff told both the tower officer and the building floor officer that he would not move.  (ECF No. 161-4 at 2.).

28.  When the officers arrived to escort plaintiff to building 2, he again refused to be re-housed.  He stated that he would rather go to ad seg.

29.  Inmates are not permitted to choose their housing assignment, or refuse a housing assignment.

30.  Rosario placed plaintiff in handcuffs and escorted him out of building 4.  Sergeant Easterling followed behind.

_____

[9]  Plaintiff disputes this fact, claiming that on November 3, 2008, Rosario and Garcia did not follow the rules and regulations.  (ECF No. 161-2 at 2.)  However, the undisputed fact as written addresses how a search is conducted, not the reasons why a particular search was conducted. Moreover, plaintiff does not contend that the search was inappropriately conducted (ECF No. 150-2 at 9), but rather contends that the search was ordered for retaliatory reasons.

31. The specific details of what transpired during the escort are disputed. Defendants contend that plaintiff became physically resistive. Plaintiff denies he became resistive, but concedes that he turned his head to the left and right in attempts to locate Sgts. Durfey and Easterling. (ECF No. 161-4 at 2.) In his deposition, plaintiff concedes that he turned his head to look behind him, and that his pace slowed. (Pl.'s Depo. at 48-49; 49-50; 53.)

32. Plaintiff disputes defendant Rosario's version of how plaintiff was taken to the ground.

33. Once plaintiff was prone on the ground, Rosario placed his right knee on the middle of plaintiff's back.

34. The use of force occurred on concrete.

35. Officer Koelling and Sgt. Durfey responded after plaintiff was on the ground. Once they arrived, Rosario helped plaintiff up from the ground. Then Officer Koelling escorted plaintiff to the primary clinic for medical clearance and documentation for any injuries sustained during the use of force.

36. The entire escort took approximately five or six minutes.[10]

37. Rosario did not have any further interaction with plaintiff that day.

38. Rosario did not have any encounters with plaintiff from August 5, 2008, until November 3, 2008.

39. Plaintiff claims that he sustained injuries to his left shoulder and back.

40. The medical report generated immediately after the use of force incident indicates that plaintiff sustained abrasions to his left shoulder and left knee with no active bleeding, but the nurse noted dry blood on the knee abrasion. (ECF No. 150-6 at 13.)

41. At the clinic, plaintiff pointed out all of his alleged injuries sustained from the escort incident, and a nurse provided treatment. The nurse cleaned plaintiff's shoulder and put on a

---

[10] Plaintiff claimed it was not necessary to use force because control was never lost. (ECF No. 161-2 at 4.) Plaintiff did not claim that the escort took longer than five or six minutes or indicate how long he estimated the escort took. (Id.) In his deposition he stated that most escorts took 120 seconds, but no more than three minutes. (Pl.'s Depo. at 51.) He testified that after he was taken down, he was on the ground for five minutes. (Pl.'s Depo. at 59.)

band-aid.  The nurse also put cream and a bandage on plaintiff's knee.  The nurse examined

plaintiff's back, but did not provide treatment for it.  (Pl.'s Depo at 67-68.)

42.  Defendants contend that the medical report created that day does not indicate that

plaintiff suffered from any serious injuries as a result of the August 5, 2008 use of force.  Plaintiff

contends that all of the medical reports demonstrate he sustained injuries during the take down.

43.  After plaintiff was examined and treated in the clinic, he was rehoused in ad seg,

pending administrative review.

44.  Plaintiff was issued a RVR for "Resisting Staff Resulting in the Use of Force," based

on the events of August 5, 2008.[11]

45.  Plaintiff was found guilty of the charge at a disciplinary hearing, based on the

findings that plaintiff attempted to break free from Rosario's escort by abruptly stopping and

spinning away from his grasp, necessitating the use of physical force to gain control of him.

46.  At the time the guilty finding was issued, plaintiff was assessed a credit forfeiture of

ninety days.  The RVR conviction remains valid.

47.  Plaintiff disputes that it was necessary to use force to gain plaintiff's compliance with

a lawful order.[12]

48.  On August 14, 2008, plaintiff transferred from ad seg to Yard 1.

49.  On Saturday, August 16, 2008, plaintiff informed staff that he wanted to file a

complaint for excessive force against Rosario for the force used during the August 5, 2008

incident.  Plaintiff signed grievance Log No. CSP-S-08-03370 on August 16, 2008.  (ECF No. 38-

3 at 4.)

---

[11]  Plaintiff contends that he was not resisting during the escort and that the use of force was not necessary, but concedes that he turned his head from left to right and slowed the escort.  The record reflects that plaintiff was issued the RVR.

[12]  Defendants contend that based on the court's prior finding that plaintiff's excessive force claim against defendant Easterling was dismissed as Heck-barred, it is now undisputed that it was necessary to use force to gain plaintiff's compliance with a lawful order.  (ECF No. 150-2 at 7, citing Heck v. Humphrey, 512 U.S. 477 (1994).)  However, in Simpson v. Thomas, 528 F.3d 685 (9th Cir. 2008), the Ninth Circuit concluded that Heck is not an evidentiary bar, but a claims bar. Simpson, 528 F.3d at 695-96, and Simpson should be permitted to tell the jury his entire story surrounding the use of force.  Id. at 696.

18

50.   Plaintiff was then placed in ad seg pending resolution of his excessive force complaint and a determination made by the Interdisciplinary Classification Committee regarding Plaintiffs appropriate program and housing needs.

51.   On August 18, 2008, the Committee upheld the order to retain plaintiff in ad seg pending investigation into the allegations of excessive use of force by staff.

52.   On October 31, 2008, plaintiff transferred from the ad seg building on Yard 2 to the general population in building 6, Yard 1.

53.   On Monday, November 3, 2008, Rosario was assigned to assist in providing coverage of the Yard 1 cafeteria during the breakfast period.

54.   On November 3, 2008, Garcia was assigned to provide coverage of the Yard 1 cafeteria during the breakfast hour.

55.   Typically, after a use of force incident, the inmate receives a housing assignment on a different yard.  This reassignment is done to protect the integrity of any ongoing investigation and to ensure the continued safety of both the inmate and officer.

56.   After the August 5, 2008 use of force incident, plaintiff was immediately rehoused in the ad seg building, which is located on Yard 2.  From August 5, 2008, until November 3, 2008, Rosario had no encounters with plaintiff.  Rosario was not aware that plaintiff was transferred from the ad seg to building 6, Yard 1 on October 31, 2008.

57.   Defendant Rosario declares that on November 3, 2008, he noticed plaintiff exiting the dining hall on Yard 1, and that because he was not aware of plaintiff's recent transfer from Yard 2, Rosario believed plaintiff was in an unauthorized area.  (ECF No. 150-3 at 4.)  Plaintiff disputes Rosario's alleged belief.  Plaintiff contends that because Rosario allegedly told Garcia "Lock his ass up, I'll stand over, that's the muthafucker I have to go to court about," demonstrates that defendant Rosario retaliated against plaintiff for the excessive force complaint because Rosario's words resulted in his being searched and handcuffed for no legitimate penological reason.

////

////

19

58.  Defendant Rosario declares that he requested that Garcia assist him in confirming plaintiff's housing assignment in the program office.[13]  (ECF No. 150-3 at 5.)  Plaintiff maintains that defendant Rosario ordered Garcia to "take [plaintiff] to medical for a 7219," apparently in preparation for his return to ad seg.  (ECF No. 161-4 at 21.)

59.  Defendant Rosario declares that before escorting plaintiff to the program office, Rosario and Garcia were required to search plaintiff for weapons or other contraband, and Rosario assisted Garcia to conduct a quick clothed body search outside of the entrance/exit door of the dining hall, so that they could escort plaintiff to the program office.  Plaintiff contends only Garcia searched and handcuffed plaintiff, and only Garcia escorted plaintiff toward medical until Lt. Bickham stopped it after Officer Freitas alerted Lt. Bickham to the incident.  (ECF No. 161-3 at 10.)

60.  The search was completed within approximately one minute.  It was performed in accordance with Rosario's and Garcia's usual custom and practice, following the rules and regulations set forth by the CDCR, and adhering to defendants' duty to maintain the safety and security of the dining area.

61.  Garcia does not recall any interaction with plaintiff before November 3, 2008.

62.  Plaintiff did not submit a prison grievance against Garcia before November 3, 2008.

63.  Garcia declares that he did not regularly work in the same housing unit as Rosario, did not know Rosario very well, and was not familiar with any complaints that may have been submitted against Rosario by inmates.

64.  On November 3, 2008, plaintiff filed prison grievance 08-3956 against Rosario and Garcia claiming that the search and handcuffing were improper and conducted out of retaliation for plaintiff's August 16, 2008 excessive force claim against Rosario.  (ECF No. 150-6 at 17.)

////

////

---

[13]  Plaintiff disputes this fact, citing Garcia's interrogatory response that he does not recall an incident on November 3, 2008, involving plaintiff.  (ECF No. 161-3 at 10.)  However, both plaintiff and defendant Rosario recall Garcia's presence.

65.   Plaintiff alleges that the search and handcuffing conducted on November 3, 2008, was done in retaliation for the excessive force complaint that he submitted against Rosario on August 16, 2008, for the August 5, 2008 use of force incident.

66.   The parties dispute how plaintiff arrived in McGuire's office on February 16, 2009.[14] However, the evidence reflects that McGuire conducted an interview of plaintiff in connection with plaintiff's appeal, Log No. CSP-S-08-3956, in which plaintiff appealed the actions of Rosario and Garcia on November 3, 2008, complaining about staff harassment and reprisal.

67.   McGuire did not interact with plaintiff or know who he was before February 16, 2009.

68.   At the February 16, 2009 meeting, plaintiff stated that he wanted to discuss an inmate grievance regarding a search conducted by Rosario and Garcia on November 3, 2008, which is the subject of grievance number SOL-05-08-3956.

69.   The parties dispute whether McGuire was aware of plaintiff's prior appeals before the February 16, 2009 meeting.

70.   During the meeting, plaintiff expressed his dissatisfaction with the search that Rosario and Garcia conducted on November 3, 2008.  Plaintiff also stated that it was his belief that the search was performed in retaliation for an excessive force complaint that was submitted against Rosario in August 2008.

71.   The parties dispute what was specifically stated during the February 16, 2009 meeting.

72.   The parties dispute the true motivation behind plaintiff's placement in ad seg on February 16, 2009.  McGuire declares that based on plaintiff's comments during the meeting, McGuire deemed plaintiff to be a threat to the safety of Rosario, and placed plaintiff in ad seg based on legitimate security concerns.  Plaintiff alleges that McGuire placed him in ad seg on

---

[14]  In his declaration, McGuire declares that he met with Plaintiff at his request on February 16, 2009.  However, in his response to interrogatory number 1, McGuire states that he conducted an appeal interview with plaintiff on February 16, 2009, but did not recall whether he called plaintiff into the program office for that interview.  (ECF No. 162 at 26.)  Plaintiff contends that McGuire called plaintiff into McGuire's office for the interview.

February 16, 2009 in retaliation for the excessive force complaint that plaintiff submitted against

Rosario on August 16, 2008, for the August 5, 2008 use of force incident.

73. McGuire had no other interactions with plaintiff.

74. Plaintiff did not submit a prison grievance against McGuire before February 16, 2009.

C. Discussion

1. Alleged Excessive Force

a. Legal Standards

The use of excessive force by a prison official violates the Eighth Amendment. Hudson v.

McMillian, 503 U.S. 1 (1992). Determining whether there has been an Eighth Amendment

violation turns upon "'whether force was applied in a good faith effort to maintain or restore

discipline or maliciously and sadistically for the very purpose of causing harm.'" Id. at 6

(quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)).

To determine whether the use of force violates the Eighth Amendment, the court should

consider the "extent of injury . . ., the need for application of force, the relationship between that

need and the amount of force used, the threat 'reasonably perceived by the responsible officials,'

and 'any efforts made to temper the severity of a forceful response.'" Hudson, 503 U.S. at 7

(quoting Whitley, 475 U.S. at 321); see also LeMaire v. Maass, 12 F.3d 1444, 1454 (9th Cir.

1993) (considering need for application of measure or sanction complained of, relationship

between need and measure or sanction used, extent of any injury inflicted and extent of

surrounding threat to safety of staff and inmates); Spain v. Procunier, 600 F.2d 189, 195 (9th Cir.

1979) (guards may use force only in proportion to need in each situation).

b. Discussion

Defendant Rosario declares that:

> Inmates are not permitted to delay or impede an escort, or otherwise
> prevent an officer from carrying out his lawful duties. An inmate
> that slows his pace or stops during an escort creates a dangerous
> situation that could quickly escalate to violence. An escorting
> officer must act quickly to regain control of the inmate. An inmate
> who turns around during an escort can compromise the escorting
> officer's grip, threatening the safety and security of the officer and
> others. Under these circumstances, the escorting officer must

regain control of the inmate before the inmate has the opportunity
to break free of the escort.

(ECF No. 150-3 at 3.)  Defendants' initial use of force is supported by plaintiff's conceded actions of turning his head and slowing the escort, and the subsequent RVR in which plaintiff was found guilty of "Resisting Staff Resulting in the Use of Force."  (ECF No. 54-3 at 3-6.) However, plaintiff and defendant Rosario present two different versions of events concerning what occurred during the February 5, 2008 escort and take down.  Each attested to his version of events under penalty of perjury.  Such disputes over what happened and why give rise to material issues of fact about the force needed and, in turn, whether the force used by defendant was applied in good faith to restore order or, instead, maliciously and sadistically to cause plaintiff harm.  Further, the undersigned is not persuaded that plaintiff has failed to show that his injuries were not de minimis; rather, in addition to the two abrasions that were treated on February 5, 2008, the fact that plaintiff presented at medical the following day, complaining of low back and shoulder pain, resulting in plaintiff receiving an injection of Tramadol for pain, supports plaintiff's claim that he was in pain after the use of force on concrete.  Wilkins, 559 U.S. at 39 n.2, citing Oliver v. Keller, 289 F.3d 623, 628 (9th Cir.2002) (rejecting the view "that to support an Eighth Amendment excessive force claim a prisoner must have suffered from the excessive force a more than de minimis physical injury" (internal quotation marks omitted).

Such factual disputes preclude summary judgment for defendant Rosario on plaintiff's alleged excessive force claim.

c. Qualified Immunity

Defendant Rosario contends that he is entitled to qualified immunity.  Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In ruling upon the issue of qualified immunity, one inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("The judges

23

1  of the district courts and the courts of appeals should be permitted to exercise their sound

2  discretion in deciding which of the two prongs of the qualified immunity analysis should be

3  addressed first in light of the circumstances in the particular case at hand").  The other inquiry is

4  whether the right was clearly established.  <u>Saucier</u>, 533 U.S. at 201.  The inquiry "must be

5  undertaken in light of the specific context of the case, not as a broad general proposition. . . ."  <u>Id.</u>

6  "[T]he right the official is alleged to have violated must have been 'clearly established' in a more

7  particularized, and hence more relevant, sense:  The contours of the right must be sufficiently

8  clear that a reasonable official would understand that what he is doing violates that right."  <u>Id.</u> at

9  202 (citation omitted).  In resolving these issues, the court must view the evidence in the light

10  most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  <u>Martinez</u>

11  <u>v. Stanford</u>, 323 F.3d 1178, 1184 (9th Cir. 2003).  Qualified immunity protects "all but the plainly

12  incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341

13  (1986).

14          Based on the disputes of material fact raised by plaintiff, defendant Rosario is not entitled

15  to qualified immunity.  As to the use of force, defendant Rosario contends that he believed that it

16  was necessary to take plaintiff to the ground to control him.  However, plaintiff contends that,

17  while handcuffed, he was jerked into the air and slammed on his left shoulder onto the concrete.

18  Defendant contends that plaintiff resisted the escort by turning his head, slowing down, and

19  pulling away, thus necessitating that he be taken down to the ground.  However, plaintiff

20  contends that he was not resisting, and that the escort was slowed so that Sgt. Easterling could

21  catch up with the escort.  Plaintiff also contends that defendant Rosario pressed his full body

22  weight into plaintiff's spine after plaintiff was prone on the ground, handcuffed behind his back,

23  and not resisting.  Plaintiff also contends that skin was torn off his knee, the abrasion on his

24  shoulder left a permanent scar, and that he sustained injuries to his neck and back.  Thus, there

25  remain material facts in dispute as to whether defendant Rosario used excessive force on plaintiff.

26  Plaintiff's rights under the Eighth Amendment rights were clearly established at the time of the

27  incident, <u>see,e.g.</u>, <u>Whitley</u>, 475 U.S. at 320-21 (excessive force), and the material disputes of fact

28  preclude a finding that defendant Rosario is entitled to qualified immunity.

24

1                     2.  Alleged Retaliation:  Defendants Rosario and Garcia

2                            a.  Legal Standards

3          Retaliation by a state actor for the exercise of a constitutional right is actionable under

4   § 1983 even if the act, when taken for different reasons, would have been proper.  Mt. Healthy

5   City Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977).  While the Constitution does not

6   expressly refer to retaliation, it is actionable because retaliatory actions may chill the exercise of

7   constitutional rights.  Perry v. Sindermann, 408 U.S. 593 (1972).  Courts considering retaliation

8   claims brought by prisoners must guard against "excessive judicial involvement in day-to-day

9   prison management, which 'often squander[s] judicial resources with little offsetting benefit to

10  anyone.'"  Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995) (quoting Sandin v. Conner, 515

11  U.S. 472, 482 (1995)).

12         "Within the prison context, a viable claim of First Amendment retaliation entails five

13  basic elements."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).  First, the prisoner

14  must show that "the retaliated-against conduct is protected.  The filing of an inmate grievance is

15  protected conduct."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing Rhodes, 408

16  F.3d at 568).  Second, the prisoner must show that a state actor took some adverse action against

17  the prisoner.  Id. (citing Rhodes, 408 F.3d at 568).  "The adverse action need not be an

18  independent constitutional violation."  Id.  (citing Pratt, 65 F.3d at 806).  Third, the prisoner must

19  show causation; that is, that the adverse action was taken because of the prisoner's protected

20  conduct.  Id.  The timing and nature of the alleged retaliatory acts may evidence a retaliatory

21  motive.  See Pratt, 65 F.3d at 808; Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314-16 (9th

22  Cir. 1989).  However, mere allegations of a retaliatory motive will not defeat a summary

23  judgment motion.  See Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994).  Fourth, the

24  prisoner must show that defendants' retaliatory actions "chilled the inmate's exercise of his First

25  Amendment rights."  Rhodes, 408 F.3d at 567-68.  A plaintiff who fails to allege a chilling effect

26  may nonetheless succeed in his claim if he presents evidence that "he suffered some other harm,"

27  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009), that is "more than minimal," Rhodes, 408

28  F.3d at 568 n.11.  Finally, the plaintiff must present evidence that the prison authorities'

                                        25

retaliatory "action did not reasonably advance a legitimate correctional goal." Id. at 567-68. The Ninth Circuit has held that "preserving institutional order, discipline, and security are legitimate penological goals that, if they provide the motivation for an official act taken, will defeat a claim of retaliation." Barnett, 31 F.3d at 816; Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985). When considering this final factor, courts should "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Pratt, 65 F.3d at 807 (quoting Sandin, 515 U.S. at 482).

Thus, to obtain summary judgment on plaintiff's retaliation claim, "Defendants have the burden to demonstrate that there are no genuine issues of fact supported by evidence as to at least one of the essential elements of a retaliation claim and, as a result, plaintiff cannot prevail on the claim." Fields v. Velasco, 2012 WL 3628862, at *3 (E.D. Cal. Aug. 21, 2012) (citing Celotex, 477 U.S. at 323). Here, defendants do not contest that plaintiff's earlier conduct was protected. (ECF No. 150-1 at 20-22.) Rather, defendants focus on their position that plaintiff cannot demonstrate retaliatory intent, and that the search and handcuffing served legitimate correctional penological interests.

b. Discussion

Here, "the burden is on plaintiff to demonstrate that legitimate correctional purposes did not motivate the actions by prison officials about which he complains." Pratt, 65 F.3d at 806. Defendants argue that the search and handcuffing served legitimate penological interests because inmates are subject to random searches upon exiting the dining hall, and defendant Rosario's actions were motivated by his belief that plaintiff was in an unauthorized area of the prison.

However, because "prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right," the court must examine whether evidence of a retaliatory motive exists. Bruce, 351 F.3d at 1289 (citations omitted).

Thus, defendants' contention that defendants were authorized to search plaintiff because he was exiting the dining hall is insufficient to defeat summary judgment because it is simply a

1   general justification for the search.  Indeed, defendant Rosario claims the search occurred because

2   he believed plaintiff was not authorized to be in that area, not because plaintiff had just exited the

3   dining hall.  Defendants argue that because plaintiff alleges no facts demonstrating that the

4   conditions of his search on November 3, 2008, were anything out of the ordinary, he cannot

5   establish retaliatory intent.  (ECF No. 160-1 at 20.)  However, in light of <u>Bruce</u>, as well as the

6   material disputes of fact discussed below, such argument is unavailing.

7           To show causation, plaintiff must show that his "protected conduct" was the "substantial

8   or motivating factor" behind the search.  <u>Sorrano's</u>, 874 F.2d 1310.  Therefore, at the summary

9   judgment stage, plaintiff need only "put forth evidence of retaliatory motive, that taken in the

10   light most favorable to him, presents a genuine issue of material fact as to intent." <u>Brodheim</u>, 584

11   F.3d at 1271 (citing <u>Bruce</u>, 351 F.3d at 1289).  In reviewing the causal connection between

12   defendant Rosario's actions and plaintiff's protected activity, the court is to draw all reasonable

13   inferences in plaintiff's favor.  "However, a causal connection will not be inferred from one

14   statement, but from the cumulative circumstances." <u>Fields</u>, 2012 WL 3628862, at *5 (citing

15   <u>Curtis v. Buckley</u>, 2011 WL 2551369 (E.D. Cal. June 27, 2011)).  To determine defendants'

16   motivation, "the Court looks to Defendant's knowledge of the protected activity, Defendant's

17   conduct and statements, proximity in time between the protected activity and the adverse action,

18   and the nature of the action." <u>Fields</u>, at *5 (citing <u>Soranno's</u>, 874 F.2d at 1316).

19           Here, it is undisputed that the use of force incident occurred 90 days prior to the

20   November 3, 2008 incident, so there is no proximity in time between the protected activity and

21   the adverse action.  However, defendant Rosario was the correctional officer who used force on

22   plaintiff in the August 5, 2008 incident.  In addition, the record reflects that defendant Rosario

23   signed the RVR resulting from the August 5, 2008 use of force on August 19, 2008, three days

24   after plaintiff signed his appeal on August 16, 2008, claiming that Rosario used excessive force.

25   (ECF Nos. 150-6 at 7; 38-3 at 4.)  This raises an inference that defendant Rosario was aware of

26   the excessive force appeal at the time the search was ordered.

27   ////

28   ////

27

1    Moreover, plaintiff adduced evidence that defendant Rosario told Garcia, "Lock his

2    [plaintiff's] ass up . . . that's the muthafucker I have to go to court about." (ECF No. 161-4 at

3    21.) In their reply, defendants argue that in plaintiff's declaration, he asserted that he "believed"

4    Rosario said something to the effect that plaintiff was the reason Rosario had to go to court, and

5    that plaintiff's "belief" does not constitute evidence. (ECF No. 166 at 2, citing ECF No. 161-4 at

6    21.) However, reading plaintiff's entire sentence in context suggests that plaintiff's "belief"

7    describes the timing of the statement, not his "belief" that the statement was heard:

8    
9    > 3. As I headed towards my housing unit walking past C/O Rosario I heard the following:

10   > D. Rosario: "Lock his ass up," he stepped back towards the dirt track and said, "I'll stand over here." C/O Garcia grabbed me and I

11   > believe I heard at this point Rosario say, "that's the muthafucker I have to go to court about."

12   (ECF No. 161-4 at 21.) Moreover, in his deposition, plaintiff testified that Rosario made all of

13   the above statements. (Pl.'s Depo. at 88-89.)

14   Such statements, taken as true, raise an inference that defendant was aware of plaintiff's

15   excessive force appeal and acted with retaliatory intent. By contrast, defendant Rosario claims he

16   believed that plaintiff was in an unauthorized part of the prison. However, it is undisputed that

17   gaining access to a different yard or facility is extremely difficult. Thus, there is a dispute of fact

18   as to defendant's motive in ordering the search of plaintiff. Moreover, there is also a dispute of

19   fact as to whether defendant Rosario intended plaintiff to be escorted to medical prior to

20   rehousing in ad seg (plaintiff's position) or whether plaintiff was to be escorted to the program

21   office for his housing to be confirmed (defendant's position). Defendant Garcia does not recall

22   the events of November 3, 2008, and the parties provided no other percipient witness declarations

23   as to the events of November 3, 2008. Because there is conflicting evidence relevant to these

24   cumulative circumstances, summary judgment on plaintiff's retaliation claim against defendant

25   Rosario is not appropriate.

26   Turning to plaintiff's retaliation claim against defendant Garcia, such claim fails because

27   plaintiff did not adduce evidence as to defendant Garcia's retaliatory intent. In his deposition,

28   plaintiff stated that during the escort away from where plaintiff was searched and handcuffed,

28

1    Garcia told plaintiff:  "I [Garcia] don't know nothing about it.  I'm just doing what he [Rosario]

2    told me to do."  (Pl.'s Depo. at 90-91.)  Indeed, in plaintiff's grievance, 08-03956, plaintiff stated

3    that defendant Garcia "seemed confused."  (ECF No. 150-6 at 17.)  It is undisputed that defendant

4    Garcia was a relief correctional officer who filled in for officers on their days off, and that

5    defendant Garcia did not know defendant Rosario very well, and did not regularly work with

6    Rosario in the same housing unit.  Plaintiff adduced no evidence demonstrating that defendant

7    Garcia was aware of plaintiff's excessive force complaint against defendant Rosario, and plaintiff

8    alleges no statements attributable to defendant Garcia that would raise an inference of retaliatory

9    intent.  As set forth above, the timing of the grievance, standing alone, is too attenuated to provide

10   a retaliatory motive for defendant Rosario, let alone defendant Garcia, who declares he is not

11   familiar with any complaints that may have been submitted against Rosario.  Accordingly,

12   defendant Garcia is entitled to summary judgment on plaintiff's retaliation claim.

13                          c.  Qualified Immunity:  Defendant Rosario

14          Because defendant Garcia is entitled to summary judgment, the undersigned addresses

15   only defendant Rosario's request for qualified immunity.  Generally, "government officials enjoy

16   qualified immunity from civil damages unless their conduct violates 'clearly established statutory

17   or constitutional rights of which a reasonable person would have known.'"  Jeffers v. Gomez, 267

18   F.3d 896, 910 (9th Cir.2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  As set

19   forth above, the two-part test under Saucier, 533 U.S. at 201, is employed to determine whether a

20   government officer is entitled to qualified immunity:  (1) whether the facts alleged, when viewed

21   in the light most favorable to plaintiff, show the officer's conduct violated a constitutional right;

22   and (2) whether the right is "clearly established."  Id.  Summary judgment based on qualified

23   immunity is appropriate if the law did not put the officer on notice that his conduct would be

24   clearly unlawful.  Id. at 202.  Courts may use their discretion in deciding which of the two prongs

25   to apply first, and defendants are entitled to qualified immunity if either prong is satisfied.

26   Pearson, 555 U.S. at 249.

27          Here, there is a genuine issue of material fact as to whether defendant Rosario had a

28   retaliatory motive when he ordered plaintiff searched and handcuffed on November 3, 2008.

1    Thus, when viewed in the light most favorable to plaintiff, the facts show that defendant Rosario

2    violated plaintiff's First Amendment rights.  See Saucier, 533 U.S. at 201.  "The prohibition

3    against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified

4    immunity purposes."  Bruce, 351 F.3d at 1290 (quoting Pratt, 65 F.3d at 806).  Accordingly,

5    defendant Rosario is not entitled to qualified immunity.

6                    3.  Alleged Retaliation:  Defendant McGuire

7                         a.  Legal Standards

8            As set forth above, prisoners have a First Amendment right to file prison grievances and

9    pursue civil rights litigation in the courts.  Rhodes, 408 F.3d at 567 (internal quotations and

10    citations omitted).  Purely retaliatory actions against a prisoner for exercising these rights

11    necessarily undermine the protections of the First Amendment; therefore, such retaliatory actions

12    violate the Constitution and are cognizable claims under § 1983.  Id.  In the prison context, a

13    viable claim of First Amendment retaliation entails:  (1) an assertion that a state actor took some

14    adverse action against a prisoner (2) because of (3) that prisoner's protected conduct, and that

15    such action (4) chilled the prisoner's exercise of his First Amendment rights, and (5) the action

16    did not reasonably advance a legitimate correctional goal.  Id.

17                         b.  Discussion

18            Defendants contend that the six month delay between the excessive force complaint on

19    August 16, 2008, and the February 16, 2009 alleged retaliatory act fails to establish a retaliatory

20    motive on the part of defendant McGuire.  (ECF No. 150-1 at 22.)  However, defendant McGuire

21    concedes that he learned of the excessive force appeal during the February 16, 2009 interview,

22    and that plaintiff expressed his dissatisfaction with the search conducted by Rosario and Garcia

23    on November 3, 2008.  Moreover, in the second level appeal response to SOL 09-00684, Warden

24    Haviland stated that McGuire had staff complaint log CSP-S-08-3956 during the February 16,

25    2009 interview because "Lt. McGuire had been assigned as the Second Level appeal reviewer and

26    was properly acting as a designee and on behalf of the Warden."  (ECF No. 38-10 at 17.)  These

27    allegations raise an inference that at least by February 16, 2009, defendant McGuire was aware of

28    plaintiff's claims contained in appeal 08-3956, which included plaintiff's claim that the actions on

1    November 3, 2008, were taken in "harassment or reprisal" for plaintiff's prior complaint against

2    defendant Rosario.  (ECF No. 150-6 at 18.)  Thus, there is a proximity in time, because defendant

3    McGuire learned of both appeals during the February 16, 2009 interview, and admittedly reported

4    the alleged threat made by plaintiff shortly thereafter.

5            However, while "timing can be properly considered as circumstantial evidence of

6    retaliatory intent," there generally must be something more than timing alone to support an

7    inference of retaliatory intent.  Pratt, 65 F.3d at 808.  Retaliation is not established simply by

8    showing adverse activity by defendant after protected speech; plaintiff must show a nexus

9    between the two.  See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (a retaliation

10   claim cannot rest on the logical fallacy of post hoc, ergo propter hoc, i.e., "after this, therefore

11   because of this").

12           Here, there are disputes of fact as to what was said by McGuire and plaintiff during the

13   February 16, 2009 interview.  In his declaration, plaintiff claims that during the February 16,

14   2009 interview, McGuire said:  "You are here about a complaint against officer Rosario for

15   harassment, you wrote him [Rosario] up for excessive force?"  (ECF No. 161-4 at 10.)  When

16   plaintiff affirmatively responded, plaintiff contends McGuire said "it is not uncommon to suffer

17   injuries during a takedown."  (ECF No. 161-4 at 10.)  Plaintiff claims he responded that the

18   complaint was dealt with and he didn't think they should talk about it.  Plaintiff then states that

19   McGuire responded by stating "I talk about whatever I want, this is going to stop, I am seriously

20   thinking about locking you up!"  "What do you want from this, money?"  (Id.)  Plaintiff

21   responded, "I want him to stop hurting people, I have a right to file a complaint if I feel I've been

22   done wrong."  (Id.)  Toward the end of the interview, plaintiff claims defendant McGuire stated

23   "my job is to protect the interest of my officer, you will be leaving before my officer."  Plaintiff

24   was dismissed back to the yard and returned to his cell, but about five minutes later he was called

25   back to the program office where Sgt. Fowler questioned him about his appeals.  (Id.)  Plaintiff's

26   statements track those he made in his February 23, 2009 administrative appeal, Log No. CSP-S-

27   09-00684.  (ECF No. 38-10 at 4-6.)

28   ////

On the other hand, defendant McGuire declares that when he asked plaintiff what he wanted to achieve through the grievance process, plaintiff "stated that he wanted Rosario punished and removed from his job as a correctional officer so that he could no longer hurt anyone." (ECF No. 150-5 at 4.)  McGuire further declares that after he informed plaintiff that McGuire did not have authority to change an officer's job assignment, plaintiff stated, "he was not going to be responsible for what happened if Officer Rosario stayed on the yard." (ECF No. 150-5 at 4.)  Further, defendant McGuire declares that based on plaintiff's comments during the meeting, he

> deemed them to be a threat to the safety of Officer Rosario. Because [McGuire] felt that Officer Rosario's personal safety would be at risk if he continued to work on the same yard where Mitchell was housed, [McGuire] concluded [his] meeting with Mitchell and immediately authorized his placement in Ad-Seg. pending further action by [McGuire's] supervisor and the Unit Classification Committee.   Then [McGuire] documented [his] conversation with Mitchell and reported the meeting to [his] supervisor.

(ECF No. 150-5 at 4.)

In the ad seg unit placement notice, signed by McGuire on February 16, 2009, McGuire wrote that during the interview, plaintiff stated:  "My goal is to see that Officer Rosario is punished, that he no longer is a Correctional Officer and can no longer hurt anyone." (ECF No. 161-5 at 74.)  In his response to plaintiff's interrogatory numbers 3 and 4, defendant McGuire stated that he did not recall the specific words plaintiff used during the February 16, 2009 interview, but added in response to number 4:  "but I believe Plaintiff stated he was going to get Rosario fired." (ECF No. 162 at 26-27.)  In his responses to interrogatory numbers 14 and 15, defendant McGuire responded, in pertinent part:  "Plaintiff's comments about Officer Rosario, in combination with his immediate behavior and demeanor during the February 16, 2009 interview, led me to believe that Plaintiff posed a potential threat to the safety of the institution." (ECF No. 162 at 29-30.)  In his response to plaintiff's interrogatory number 16, defendant McGuire stated that

> at the time that [he] interviewed Plaintiff on February 16, 2009, [McGuire] did not determine that [plaintiff] was an "immediate" threat.   After reflecting on Plaintiff's statements, the need to

1

2

3

4

> preserve the integrity of the ongoing investigation into Plaintiff's complaints against Officer Rosario, to protect Rosario, to protect against any future reprisals against plaintiff, and to protect against Plaintiff's potential future claims of reprisals, [McGuire] recommended that Plaintiff be transferred to the administrative segregation unit so that the classification committee could determine the most appropriate placement for Plaintiff.

5   (ECF No. 162 at 30.)

6       In his SAC, plaintiff claimed that defendant McGuire retaliated against plaintiff because

7   plaintiff chose not to drop his complaint against defendants Rosario and Garcia.  (ECF No. 51 at

8   9.)  In opposition to the motion, plaintiff claims that "defendant McGuire threatened to punish

9   plaintiff with punishment if plaintiff refused to withdraw his complaint against defendant Rosario

10  and then mischaracterized plaintiff's alleged threat against defendant Rosario, in retaliation for

11  filing an excessive force complaint against Rosario."  (ECF No. 161-3 at 29.)

12      Plaintiff must show that his protected conduct was a "'substantial' or 'motivating' factor

13  behind the defendant's conduct."  Brodheim, 584 F.3d 1262, 1271 (9th Cir. 2009).  To do so,

14  plaintiff may rely on circumstantial evidence establishing a defendant's intent or motive.  See

15  Bruce, 351 F.3d at 1288-89 (concluding prisoner raised a triable issue of fact regarding official's

16  retaliatory motive with evidence of suspect timing, stale evidence presented against the plaintiff,

17  and statements suggesting retaliatory intent that the official made).

18      Here, there are material disputes of fact as to what was said during the February 16, 2009

19  interview, during which defendant McGuire learned of plaintiff's prior appeals concerning the

20  events of November 3, 2008, and August 5, 2008.  While defendants have presented evidence that

21  McGuire believed plaintiff posed a threat to defendant Rosario, plaintiff has countered with

22  alleged statements made by McGuire which suggest that he acted with a retaliatory motive.

23  Moreover, plaintiff claims that a few minutes after he returned to his cell after meeting defendant

24  McGuire, plaintiff was taken to a different room where Sgt. Fowler[15] started questioning plaintiff

25  about his complaints, reminded plaintiff that he was housed at Salinas Valley State Prison with

26  Sgt. Fowler during all the Green wall stuff, and claimed that Fowler and Rosario were

27  "homeboys."  Plaintiff notes that although he was interviewed by McGuire at 9:00 a.m.,

28  _____
[15]  Neither party provided a declaration by Sgt. Fowler.

33

1    defendant McGuire did not place plaintiff into ad seg until 12:10 p.m., raising an inference that

2    McGuire waited to see if plaintiff would drop his appeals before ordering plaintiff into ad seg.

3    (ECF No. 161-3 at 26.)

4         While a jury may find that defendant McGuire acted for a legitimate penological purpose

5    in placing plaintiff in ad seg because he truly believed plaintiff posed a potential threat to the

6    safety of defendant Rosario, taking plaintiff's version of what happened on February 16, 2009, as

7    true, a reasonable jury could also find that defendant McGuire acted with a retaliatory motive.

8    Thus, defendant McGuire is not entitled to summary judgment.

9                        c.  Qualified Immunity:  Defendant McGuire

10        Defendant McGuire contends he is entitled to qualified immunity.  The standards

11   governing qualified immunity are set forth above.

12        As indicated above, the evidence, construed in the light most favorable to plaintiff, could

13   permit a rational jury to conclude that defendant McGuire placed plaintiff in ad seg in retaliation

14   for plaintiff's grievances against defendant Rosario.  In 2009, a reasonable prison official would

15   have known that retaliating against a prisoner for filing a prison grievance was unlawful.  The

16   prohibition against retaliatory punishment is "'clearly established law' in the Ninth Circuit, for

17   qualified immunity purposes."  Pratt, 65 F.3d at 806 & n.4.

18        "Where the [defendant's] entitlement to qualified immunity depends on the resolution of

19   disputed issues of fact in [the defendant's] favor, and against the non-moving party, summary

20   judgment is not appropriate."  Wilkins v. City of Oakland, 350 F.3d 949, 956 (9th Cir.2003), cert.

21   denied, 543 U.S. 811 (2004) (citation omitted).  "Where the objective reasonableness of an

22   officer's conduct turns on disputed issues of material fact, it is 'a question of fact best resolved by

23   a jury.'"  Torres v. City of Madera, 648 F.3d 1119 (9th Cir. 2011), quoting Wilkins, 350 F.3d at

24   955.

25        Because a genuine issue of fact exists regarding whether defendant McGuire retaliated

26   against plaintiff for filing appeals against defendant Rosario by placing plaintiff in ad seg,

27   defendant McGuire is not entitled to summary judgment on the issue of qualified immunity.  See

28   DiRuzza v. County of Tehama, 206 F.3d 1304, 1314-15 (9th Cir.), cert. denied, 531 U.S. 1035

34

1   (2000) (summary judgment inappropriate on retaliation claim where there were disputed issues of

2   material fact regarding whether retaliation was a substantial or motivating factor in defendants'

3   conduct); Chatman v. Tyner, 2009 WL 498958, at *14 (E.D. Cal. Feb. 26, 2009), adopted 2009

4   WL 901129 (E.D. Cal. March 31, 2009) (defendants not entitled to summary judgment on

5   retaliation claim, where plaintiff identified factual disputes concerning whether defendants placed

6   plaintiff in ad seg for retaliatory purposes).

7   IV.   Conclusion

8       In accordance with the above, IT IS HEREBY RECOMMENDED that defendants'

9   motion for summary judgment (ECF No. 150) be granted in part and denied in part, as follows:

10      1. Defendants' motion for summary judgment as to plaintiff's retaliation claim against

11   defendant Garcia be granted; and

12      2. Defendants' motion for summary judgment be denied on all remaining claims.

13      These findings and recommendations are submitted to the United States District Judge

14   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

15   after being served with these findings and recommendations, any party may file written

16   objections with the court and serve a copy on all parties.  Such a document should be captioned

17   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

18   objections shall be filed and served within fourteen days after service of the objections.  The

19   parties are advised that failure to file objections within the specified time may waive the right to

20   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

21   Dated:  February 4, 2015

22

23                                        KENDALL J. NEWMAN
                                          UNITED STATES MAGISTRATE JUDGE
24

25   /mitc3012.msj

26

27

28

                                                  35